**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MICHAEL BOEHM,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 10-CV-818-PJC** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Claimant, Michael Boehm ("Boehm"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying his applications for disability insurance and supplemental security

income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28

U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States

Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of

Appeals. Boehm appeals the decision of the Administrative Law Judge ("ALJ") and asserts that

the Commissioner erred because the ALJ incorrectly determined that Boehm was not disabled.

For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Boehm was 30 years old at the time of the hearing before the ALJ on November 30, 2009.

(R. 24). Boehm had a GED. (R. 24-25). He testified that he had some trade school training in

welding. (R. 25). Boehm testified that he last worked on October 6, 2000, when he was working

as a heavy equipment operator and chainsaw operator doing logging and land clearing in

Georgia.  *Id.*  He said that he was fired after he was injured on July 5, 2000.  *Id.*  Right after he was fired, he attempted to find work, but he testified that he could not get hired due to his injury.  (R. 25-26).

Boehm testified that he could sit for about 15 to 20 minutes, but then the pain would "really [start] setting in."  (R. 26).  The pain was in his lower back, and the best way to relieve it was to lie down, which would take the pressure off.  *Id.*  After sitting for about 15 minutes, he would lie down for about 20 or 30 minutes.  (R. 27).  In addition to the pain in his lower back, he had pain down his right leg to his calf, and down his left leg to his knee.  *Id.*  He could stand for about 15 or 20 minutes before it became too painful, but if he could move around, he could stand for about 30 minutes.  *Id.*  If he stood longer than that, the pain would become more intense, and he would start "getting twitches" in his back.  (R. 27-28).  He thought the most he could walk was about a quarter mile, because he thought that was how far it was from the parking lot to the store and back, and that distance would cause his back to hurt and his legs to get sore.  (R. 28).  He could not stand up from a seated position without using his upper body to assist in lifting.  *Id.*  Reaching forward caused him to have lower back pain.  (R. 29).  A few steps didn't bother him too much, but a lot of stairs caused trouble because his legs would hurt and he had fallen.  *Id.*  He could squat, but he would have to use his upper body to lift himself back up into a standing position.  *Id.*  He could bend, but would again have to use his upper body to return to an upright position, and bending caused an increase in his pain.  (R. 29-30).  Boehm testified that he could drive for about 30 minutes before he would need to lie down or walk around.  (R. 30).  Depending on the height of the vehicle, he had some problems getting in and out.  *Id.*  He could comfortably lift a maximum of 15 pounds occasionally.  (R. 39).

Boehm testified that he had trouble sleeping, because of pain, difficulty finding a

comfortable position, and an inability to stop thinking about things. (R. 30-31). The quickest he could get to sleep was in about 45 minutes, and some nights he didn't sleep at all. (R. 31). He woke up about every two hours. *Id.* He wasn't always sure what caused him to awaken, but sometimes it was due to pain and a need to change positions. *Id.* The pain was usually in his lower back, legs, and knees. *Id.*

Boehm testified that his pain had gotten worse since the July 5, 2000 injury. (R. 32). Boehm had been taking Lortab and Soma for pain since about 2002, and on a scale of 1-to-10, with medication, his pain was around a 7. (R. 33). At the time of the hearing, he suffered from acid reflux about every other day, along with occasional vomiting, and he believed that was due to pain medications he had previously taken and stopped taking due to the side effects. (R. 33-34).

Boehm testified that he had vision problems that he understood were from a degenerative genetic condition that caused retinal scarring, and he also had an injury in 1998 or 1999. (R. 35). His vision problems caused him to have trouble with headaches after three or four pages of reading. *Id.*

Boehm had pain and stiffness sometimes in his hands, and he did not know if that was due to arthritis or past injuries. *Id.* The pain and stiffness usually happened during rain or cold weather. *Id.*

He had been fishing about a year before the hearing, and he thought he had been out for about two or three hours. (R. 36). He described needing to have something to lean against to make it "a little easier." *Id.* Boehm testified that he did all of the cooking and cleaning for himself. *Id.* For a chore such as vacuuming, he would do half a room or one room at a time. *Id.* He said that he would try to position himself to use only his arm and not his back, but after a few

minutes of pushing, it would aggravate his back.  (R. 36-37).  Boehm testified that he did his own

cooking, but it was mostly items such as a purchased bag of pasta that he would mix with sauce.

(R. 37).  He said that he didn't cook as much as he used to, because he could not stand for long

periods of time without pain.  *Id.*  He did his own grocery shopping, but he tried to do it as

quickly as possible.  *Id.*  Boehm testified that there were days that he could not leave his house

due to pain.  (R. 38).  He said that usually happened due to weather, and he would stay lying

down, because it would hurt too much to go anywhere even with his medications.  *Id.*

Medical records reflect that Boehm was seen in the emergency department of Peachtree

Regional Hospital for a foreign body in the cornea of his right eye on January 5, 1999.  (R. 353-

57).  He was apparently referred to an ophthalmologist.  (R. 353).  He was seen at that hospital

for a blunt trauma injury on May 20, 1999 when a tree fell on him.  (R. 343-52).  It appears that

he was given instructions on wound care, given pain medication, and instructed to follow up with

his family physician.  (R. 343).

Boehm saw Chad M. Kessler, M.D., Orthopaedic and Spine Surgery, in September 2000

with a complaint of severe pain after he injured his lower back while lifting a beam at work.  (R.

358-63).  On examination, Dr. Kessler found limited forward flexion and mild tenderness to

palpation.  (R. 360).  The records reflect that Boehm could not have an MRI performed, and Dr.

Kessler therefore ordered a bone scan.  *Id.*  The results of the bone scan were "essentially

normal," and Dr. Kessler concluded that Boehm had "an internal disc derangement."  (R. 361).

He did not believe that Boehm was a surgical candidate due to his age, but he referred Boehm for

a steroid injection.  *Id.*

A new patient evaluation by Walter Edwards, M.D., P.C., Orthopaedic Surgery and

Diseases of the Spine dated November 15, 2002 states that Dr. Edwards had previously treated

Boehm, apparently at another clinic. (R. 269). The evaluation states that Boehm on examination had full range of motion in all four extremities. *Id.* Dr. Edwards recommended a CT discogram and that Boehm consider open surgery because conservative care had not been successful. *Id.*

On December 20, 2002, Thomas R. Fuller, M.D. with the Physicians' Spine Center stated that Boehm had "therapeutic injections" and had been unable to work for two years. (R. 227-28). Dr. Fuller performed a lumbar discogram and computerized tomography which had normal findings at the L4/L5 level, but provoked pain at the L5/S1 level. *Id.* Radiographs and the CT scan showed disc bulging and a "completed anular tear." (R. 227). In Dr. Fuller's opinion, the L5/S1 results showed degenerative disc disease that was probably responsible for Boehm's presenting pain. (R. 228).

Boehm returned to Dr. Edwards on January 17, 2003 with continued back pain, and Dr. Edwards noted the results of the studies conducted by Dr. Fuller. (R. 268). Dr. Edwards said Boehm was "totally disabled," and that "[n]o light work is available according to [Boehm]." *Id.* He also stated that there was no neurological deficit requiring surgery and that "[s]ubjective pain management" was Boehm's "primary problem." *Id.* He prescribed epidural steroid injections and oral medications including Lortab. *Id.*

On February 27, 2003, Boehm saw John G. Heller, M.D. at The Emory Spine Center. (R. 252-55). Dr. Heller wanted to obtain the December 2002 discogram results, and Boehm returned on April 10, 2003 for follow-up. (R. 249-50). Dr. Heller stated that the discogram confirmed Boehm's discogenic pain. (R. 249). Dr. Heller stated three treatment options for Boehm, the first of which was to continue with his symptoms and hope that they eventually resolved on their own. (R. 249-50). The second was a fusion surgery, and the third was an experimental artificial disc replacement. (R. 250).

On November 3, 2003, Dr. Edwards saw Boehm and stated that he had a herniated lumbar disc at L5/S1 and that "[s]urgery should be scheduled as needed." *Id.* Dr. Edwards said that "[a]nkle jerk" was diminished and that Boehm was managing with medications but was totally disabled. *Id.*

On April 26, 2004, Dr. Edwards said that Boehm's low back pain was constant, and Boehm had more pain in his right leg than in his left. *Id.* He said that he recommended conservative management and that Boehm could do light-duty work. *Id.*

On September 3, 2004, Dr. Edwards noted an injury dated April 26, 2004. (R. 267). Dr. Edwards said that Boehm's disc protrusion at L5/S1 "could be handled with epidural injections, traction and conservative management." *Id.* Medications included Lortab and Soma. *Id.* On November 15, 2004, Dr. Edwards said that Boehm returned with severe back pain and that he was "totally disabled and out of work." *Id.* He also stated that surgery had been recommended if treatment at the pain clinic was not successful. *Id.* He recommended a series of epidural steroid injections. *Id.* A hand-written note indicates that Boehm had an injection in December 2004. *Id.*

On December 6, 2004, Randy F. Rizor, M.D., with The Physician's Pain and Rehabilitation Specialists of Georgia, conducted a new patient evaluation on referral from Dr. Edwards. (R. 229-31). Dr. Rizor listed Boehm's diagnoses as degenerative lumbar disc and lumbar radiculitis. (R. 229). On examination, Dr. Rizor found a flattening of the lumbar lordosis, and he noted stooped posture and poor trunk muscle conditioning. (R. 230). He said there was tenderness to deep palpation of the paraspinous muscles. Trunk flexion was 90 degrees, extension was unrestricted, and straight leg raising was negative. *Id.* His assessment was probable discogenic pain at L5/S1, and he recommended a "translaminar epidural series."

*Id.* Injections were performed December 13, 2004 and January 24, 2005, at which time it was noted that Boehm had not seen a significant change in his symptoms. (R. 232-33).

On February 2, 2005, Dr. Edwards said that Boehm continued "to be out of work due to a back injury," but he also said that several recommendations for light-duty work had been proposed. (R. 266). Boehm was seen again on May 18, 2005. *Id.* On July 11, 2005, Dr. Edwards appeared to state that he could not proceed with treatment of Boehm due to the pending litigation between Boehm and the workers compensation insurance provider. (R. 265). Dr. Edwards then stated "I do [not] anticipate the need for any surgery, but he is quite young and should not be engaged in stooping, lifting, bending greater than 50 pounds." *Id.*

On December 2, 2005, Dr. Edwards noted that Boehm presented with back pain and soreness "recently." (R. 264). Dr. Edwards again stated that the litigation needed to be resolved before further treatment would be recommended. *Id.* He said a series of epidural steroid injections and physical therapy were recommended. *Id.*

Records indicate that Boehm participated in physical therapy in December 2005 and January 2006. (R. 234-39).

On January 30, 2006, Dr. Edwards described Boehm's physical examination as unchanged, and he noted that Boehm was in physical therapy while awaiting a decision by the insurance company. (R. 264). On June 7, 2006, Dr. Edwards stated that Boehm presented with "symptoms related to his left side while moving around, which aggravates his back pain." *Id.* He again noted the litigation, and he said that "[f]urther diagnostic studies would include a CT discogram as needed." *Id.*

On June 20, 2006, a physical therapist conducted a functional capacity evaluation on referral from Dr. Edwards. (R. 240-41). The results were that Boehm could do medium work for

an 8-hour day.  (R. 241).

On June 21, 2006, Dr. Edwards noted that Boehm wanted an appointment at Emory for consideration for artificial disc insertion.  (R. 263).  Boehm saw Dr. Edwards again on October 6, 2006.  *Id.*

On December 20, 2006, Randy S. Katz, D.O. with The Emory Spine Center conducted an examination.  (R. 243-48).  Dr. Katz reviewed the history of Boehm's injury and treatment.  (R. 243-44).  At the time of the examination, Boehm experienced constant low back pain at a level of about 4 out of 10.  (R. 244).  At times, the pain increased to 10 out of 10, and it occasionally would shoot into either leg briefly.  *Id.*  Boehm believed the pain was worse with standing, walking, or bending.  *Id.*  On examination, Boehm had pain on flexing forward, extension, and side bending.  (R. 246).  There was some discomfort with deep pressure.  *Id.*  His gait was normal.  *Id.*  He had some pain with straight leg raising.  *Id.*  Dr. Katz said that Boehm had a clear lumbar disc problem, but his age and level of discomfort made him a difficult candidate for the potential treatments.  (R. 247).  Dr. Katz did not believe that Boehm was a candidate for a disc replacement surgery or for an L5/S1 fusion.  *Id.*  He recommended that Boehm continue with conservative treatment, including finding a lighter-duty job and switching to less addictive pain medications.  *Id.*  Dr. Katz believed that a 50-pound lifting restriction would not worsen Boehm's condition, and that his overall impairment was 6% of the whole person.  (R. 248).

On February 5, 2007, Dr. Edwards reviewed Boehm's history, and he said that he recommended that Boehm "get more education, find a light job and take mild medication."  (R. 263).  He said that Boehm would likely never be pain-free, but that his pain could be managed in several ways.  *Id.*  On March 19, 2007, Dr. Edwards suggested that Boehm apply for Social Security disability and try to find a light work job that he could do.  (R. 262).  On April 23, 2007,

Dr. Edwards said that Boehm had reached maximum medical improvement and "could move forward" if his litigation was settled. *Id.* On August 15, 2007, Dr. Edwards said that Boehm's permanent physical impairment rating would be about 8%. *Id.* He said that Boehm appeared to be fully ambulatory without limping and disability. *Id.* On October 8, 2007, Boehm presented to Dr. Edwards with persistent symptoms regarding his back. (R. 261). Dr. Edwards said that there was nothing more he could do for Boehm, and he recommended that he continue physical therapy. *Id.*

A second functional capacity evaluation was conducted by a physical therapist on February 12, 2008 on referral from Dr. Edwards. (R. 317-18). The evaluation suggested that Boehm could perform a range of work between the light and medium exertional levels. (R. 317). The examiner stated that Boehm passed only 15 of 23 validity criteria, which suggested poor effort and borderline invalid results. *Id.*

On March 3, 2008, Dr. Edwards wrote a note stating that Boehm had reached maximum medical improvement and that his impairment was 5% to 8%. (R. 315). He stated that Boehm should be placed in a rehabilitation program for return to light-work activity, and that he should avoid stooping, lifting, or bending. *Id.* Dr. Edwards completed a workers' compensation form on that date, assigning an 8% permanent partial disability percentage. (R. 319). On that form, Dr. Edwards wrote that he recommended no stooping, lifting, or bending activity of 25 pounds or more. *Id.*

During his treatment of Boehm, Dr. Edwards often completed a Work Status Form or other form, and those forms sometimes included work restrictions. (R. 279-80, 288-303). On February 2, 2005, he checked spaces for no lifting and no climbing, bending, or stooping. (R. 299). He wrote that Boehm was "totally disabled for stooping, bending, [or] lifting." *Id.* On

January 30, 2006, Dr. Edwards wrote "no stooping [or] bending." (R. 279). On one form in 2007, he checked spaces for no prolonged standing or walking and no lifting. (R. 290). On April 23, 2007, he checked spaces for no prolonged standing or walking, no lifting over 25 pounds, no climbing, bending, or stooping, and no reaching above shoulder level. (R. 291).

On January 21, 2009, Boehm saw William C. Clark, M.D. with Tulsa Bone and Joint for continuation of treatment while Boehm was in Tulsa attending welding school as part of his workers compensation rehabilitation. (R. 371). Dr. Clark reviewed all of Boehm's medical records, and observed that Boehm had a normal gait. *Id.* He was mildly tender to palpation in his lower lumbar spine. *Id.* Dr. Clark's assessment was that Boehm had "persistent, long-term, intractable back pain from L5/S1 degenerative disc." *Id.* He recommended continuing conservative care, and he wanted Boehm to avoid Soma due to its addictive properties. *Id.*

Records show that Boehm participated in physical therapy at St. John Health System in January and February, 2009. (R. 381-94).

On September 4, 2009, Dr. Edwards completed a one-page form titled "Medical Source Opinion of Residual Functional Capacity." (R. 395). He checked spaces indicating that Boehm could sit or stand occasionally, defined as 2-3 hours in an 8-hour day. *Id.* He indicated that Boehm could frequently lift or carry 15 pounds. *Id.* He indicated that Boehm had no limitations on the use of his arms or hands. *Id.* He cited to Boehm's herniated lumbar disc and the 2002 lumbar discogram as the medical findings that supported his assessment. *Id.*

On October 19, 2009, Dr. Edwards completed a six-page form entitled "Residual Functional Capacity To Do Work Related Activities" with a back sheet and range of joint motion evaluation form. (R. 364-69). On the form, Dr. Edwards circled 10-30 minutes as the amount of time that Boehm could sit, stand, or walk at one time and total during an 8-hour day. (R. 364).

He checked spaces indicating that Boehm could occasionally lift or carry up to 20 pounds.  *Id.*
He checked spaces stating that Boehm's use of his feet for leg controls and his use of his hands
for repetitive motions or grasping were limited.  (R. 364-65).  He checked spaces indicating that
Boehm could not do the following at all: bending, squatting, crawling, climbing, reaching,
handling, and fingering.  (R. 365).  He checked spaces stating that Boehm was 100% restricted
from all environmental factors, including driving, unprotected heights, and being around moving
machinery.  *Id.*  He wrote in the space for medical findings that support his statement "previous
herniated disc surgery," and "see previous records and [Functional Capacity Evaluation]."  *Id.*
Dr. Edwards also wrote that Boehm was "totally disabled due to spinal injury - see previous
records."  (R. 366).  Dr. Edwards did not fill in any evaluation on the back sheet form.  (R. 367).
On the range of motion form, Dr. Edwards wrote "0" in as the range of motion for Boehm's back
flexion, lateral flexion, neck extension and flexion, and leg lifts, with all other categories rated as
normal.  (R. 368-69).

Nonexamining agency consultant Terry W. Banks, M.D., M.P.H., completed a Physical
Residual Functional Capacity Assessment form on December 3, 2007.  (R. 305-12).  Dr. Banks
found that Boehm had the exertional capacity to perform medium work.  (R. 306).  He indicated
that Boehm could frequently climb, balance, stoop, kneel, crouch, and crawl.  (R. 307).  He found
no other established limitations.  (R. 307-09).  Dr. Banks wrote that he had insufficient evidence
to assess the time period from the asserted date of onset to the date last insured.  (R. 310, 312).
Dr. Banks cited to the December 2005 office visit with Dr. Edwards and the December 2006
office visit with Dr. Katz as evidence supporting his assessment.  *Id.*  Dr. Banks also explained
the conflict of his opinion with the opinions given by treating physicians by stating that their
opinions were on subjects reserved to the Commissioner and that at least one opinion was not

specific.  (R. 311).

Nonexamining agency consultant Russell Wallace M.D. completed a second Physical Residual Functional Capacity Assessment dated April 7, 2008.  (R. 325-32).  Dr. Wallace found that Boehm could perform light work.  (R. 326).  Dr. Wallace briefly summarized Boehm's treating history, again finding insufficient evidence to assess the time period from onset to the date last insured.  (R. 327).  For postural limitations, Dr. Wallace indicated that Boehm could climb stairs, balance, kneel, crouch, or crawl frequently, and could climb ladders and stoop only occasionally.  *Id.*  He found no other established limitations.  (R. 328-29).  Regarding treating physician opinions, Dr. Wallace wrote that he gave "significant weight" to the opinion of Dr. Edwards that Boehm could do light work.  (R. 331).

## Procedural History

Boehm filed applications on October 11, 2007 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*.  (R. 145-57).  Boehm alleged onset of disability as February 2, 2002.  (R. 147).  The applications were denied initially and on reconsideration.  (R. 69-84).  A hearing before ALJ Charles Headrick was held November 30, 2009 in Tulsa, Oklahoma.  (R. 20-47).  By decision dated January 12, 2010, the ALJ found that Boehm was not disabled.  (R. 8-19).  On October 27, 2010, the Appeals Council denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[1] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Boehm met insured status through June 30, 2002. (R. 10). At Step One, the ALJ found that Boehm had not engaged in any substantial gainful activity since his alleged onset date of February 2, 2002. *Id*. At Step Two, the ALJ found that Boehm had a severe impairment of lumbar spine pain. *Id.* At Step Three, the ALJ found that Boehm's impairments did not meet a Listing. *Id.*

The ALJ determined that Boehm had the RFC to perform light work except only occasional climbing ladders, ropes, or scaffolds or stooping. (R. 11). At Step Four, the ALJ found that Boehm was unable to perform any past relevant work. (R. 13). At Step Five, the ALJ found that there were jobs that Boehm could perform, taking into account his age, education, work experience, and RFC. (R. 13-15). Therefore, the ALJ found that Boehm was not disabled at any time from February 2, 2002 through the date of his decision. (R. 15).

## Review

Boehm makes three arguments that the ALJ's decision should be reversed. First, he faults the ALJ's Step Five finding. Second, Boehm argues that the ALJ did not properly consider the opinion evidence. Third, Boehm faults the ALJ's credibility assessment. Regarding the issues raised by Boehm, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

**Step Five Issues**

Boehm first argues that the ALJ erred by failing to cite the strength demands in his hypothetical to the vocational expert (the "VE"). The ALJ used the Physical Residual Functional Capacity Assessment form completed by Dr. Wallace to give his RFC to the VE in the hypothetical. (R. 41). On the form, Dr. Wallace indicated the specific individual strength components that are part of the definition of light work. (R. 326). Thus, Boehm's argument makes no sense because the strength demands of light work were specifically stated in the form used by the ALJ to communicate the RFC to the VE.

Moreover, the Tenth Circuit has rejected Boehm's argument and affirmed cases where the ALJ used the defined exertional levels as part of the hypothetical asked of the VE. *Qualls v. Astrue*, 428 Fed. Appx. 841, 850-51 (10th Cir. 2011) (unpublished); *Rutledge v. Apfel*, 230 F.3d 1172, 1175 (10th Cir. 2000). There was no error in the way the ALJ described the exertional abilities in the hypothetical to the VE.

While Boehm states his next argument as one related to the hypothetical to the VE, it is more properly viewed as an attack on the RFC determination. Boehm complains that Dr. Wallace's form, completed in 2008, that was given to the VE to consider in her testimony was flawed because Dr. Wallace did not have all of the records of Dr. Edwards, including the opinions he gave in 2009, more than one year after the opinion given by the consultant. The ALJ gave adequate reasons for giving reduced weight to the opinion evidence of Dr. Edwards, as discussed below. It is not fatal to the ALJ's RFC determination, and therefore his hypothetical to the VE, that Dr. Edwards on occasion gave opinions regarding additional limitations. *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (hypothetical to VE need only reflect those limitations that are borne out by the evidentiary record).

Boehm also complains that the ALJ did not include any limitations from his reported leg pain and vision problems in his hypothetical question to the VE. The undersigned finds that the ALJ's statement of "lumbar spine pain" at Step Two was broad enough to indicate that he considered Boehm's statements that he had occasional pain in his legs, because those were not separate conditions, but related symptoms of one condition. Boehm did not have leg pain apart from the pain that resulted from his lumbar spine condition. Moreover, the ALJ specifically recounted Boehm's testimony regarding his leg pain. (R. 11). There is no reason to conclude that the ALJ did not take Boehm's leg pain into account when he formulated Boehm's RFC.

Regarding the allegation that Boehm had vision problems, Boehm simply did not establish objective medical evidence that he had any impairment, whether severe or nonsevere, of his vision. *See Williams*, 844 F.2d at 750-51 (claimant has burden of providing medical evidence to establish impairment). The 1999 record that he had been seen at an emergency room for treatment of a foreign body in his eye did not establish a vision impairment, and there was no other medical evidence in the record related to Boehm's eyes or vision. (R. 353-57). *Diaz v. Secretary of Health & Human Servs*, 898 F.2d 774, 777 (10th Cir. 1990) (Secretary did not err in finding claimant not disabled when vision problems were considered and claimant provided little corroborative evidence regarding those problems).

The undersigned finds no error at Step Five of the ALJ's decision.

**Opinion Evidence**

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable

clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

Boehm states that the ALJ failed to follow the proper procedure for evaluating treating physician opinion evidence when the ALJ decided to give Dr. Edwards' opinions "reduced weight," and the other opinion evidence "normal weight." (R. 13). Boehm also complains that the ALJ did not weigh Dr. Edwards' opinions using the factors of Section 404.1527. The undersigned finds no error in the ALJ's analysis and discussion of Dr. Edwards' opinions.

The ALJ discussed Dr. Edwards' treating records, including many statements regarding Boehm's functional abilities, in some detail. (R. 11-12). He noted that Dr. Edwards at times gave the opinion that Boehm should return to light work with restrictions on bending or lifting. *Id.* He noted other statements by Dr. Edwards that Boehm was not capable of working at all. *Id.* The ALJ also noted the functional capability evaluations completed by a physical therapist at Dr. Edwards' referral. (R. 12). The ALJ's reasons for giving Dr. Edwards' opinions reduced weight were: 1) that the extreme opinions that Boehm was not capable of even sedentary work were inconsistent with the objective medical evidence; and 2) that Dr. Edwards' opinions of Boehm's

functional capacity were inconsistent.  Both of these are specific, legitimate reasons for giving a treating physician opinion reduced weight. *White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2001) (the lack of objective evidence supporting a treating physician opinion is a legitimate basis for rejecting or discounting the opinion); *Armijo v. Astrue*, 385 Fed. Appx. 789, 794-95 (10th Cir. 2010) (unpublished) (ALJ detailed lack of supporting documentation for the degree of limitations the treating physician advanced, noted that physician's treatment notes did not support the limitations, noted that the patient's condition had not deteriorated, and "pointed to internal inconsistencies" in the treating physician opinion); *Bales v. Astrue*, 374 Fed. Appx. 780, 782-83 (10th Cir. 2010) (unpublished).

Boehm is correct that the ALJ erroneously included a sentence in his decision stating that none of Boehm's treating physicians recommended surgery.  (R. 12).  Dr. Edwards gave several opinions that were inconsistent on this point, stating in November 2002 that Boehm should consider "open surgery" because conservative care had not been successful.  (R. 269).  In January 2003, he said that there was no neurological deficit requiring surgery.  (R. 268).  In September 2004, Dr. Edwards said that surgery was recommended if pain treatment was not successful.  (R. 267).  In July 2005, he stated that surgery was not necessary.  (R. 265).  Dr. Heller, who might more accurately be considered an evaluating physician than a treating physician, listed two different surgical options as possible treatments in April 2003.  (R. 250).  Dr. Katz, also perhaps an examining physician rather than a treating physician, in December 2006 gave the opinion that Boehm was not a candidate for surgery.  (R. 247).  Thus, the medical evidence on the subject of surgery was confusing and inconsistent, and the ALJ erred in stating in a categorical fashion that surgery had not been recommended.  Under the circumstances of this case, however, that one sentence of the ALJ's decision does not indicate that surgery was a major factor that the ALJ

relied upon in assessing Boehm's credibility or in weighing the medical opinion evidence. This minor error does not "undermine confidence in the determination of this case." *Gay v. Sullivan*, 986 F.2d 1336, 1441, n.3 (10th Cir. 1993); *Whitney v. Barnhart*, 60 Fed. Appx. 266, 268 n.1 (10th Cir. 2003) (unpublished) (inconsistency in the ALJ's expression of his rationale was not material).

The ALJ committed no reversible error regarding medical opinion evidence.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

Boehm's attack on the ALJ's credibility assessment is a weak one, and perhaps that is because the ALJ thoroughly discussed the factors related to credibility and gave specific reasons for his assessment. (R. 12-13). While the ALJ incorrectly made a blanket statement that surgery had not been recommended, his point appeared to be that Boehm's condition had been extensively evaluated, with only conservative care resulting. Surgery is not required for one to be disabled. *Threet v. Barnhart*, 353 F.3d 1185, 1190 (10th Cir. 2003). However, the Tenth Circuit has approved of credibility determinations that were supported by a finding that the claimant's treatment had been conservative. *See Stokes v. Astrue*, 274 Fed. Appx. 675, 685 (10th Cir. 2008) (unpublished); *Maxwell v. Astrue*, 268 Fed. Appx. 807, 811 (10th Cir. 2008)

(unpublished); *Sanders v. Astrue*, 266 Fed. Appx. 767, 770 (10th Cir. 2008) (unpublished).

Thus, the ALJ's discussion of the extent of Boehm's treatment was one factor that supported the

ALJ's credibility assessment.

In support of his credibility assessment, the ALJ also cited to the second functional

capability evaluation performed by the physical therapist that showed poor effort by Boehm, with

borderline invalidity scores.  (R. 12, 317-18).  This was a specific reason linked to substantial

evidence supporting the ALJ's assessment.

Faced with the ALJ's discussion and reasoning, Boehm first complains that the ALJ

erroneously ignored the observation of a Social Security clerk that Boehm had difficulty standing

and sitting and showed discomfort in his back.  Plaintiff's Opening Brief, Dkt. #13, p. 8.  The

ALJ's omission of this minor fact does not require remand.  *See Holcomb v. Astrue*, 389 Fed.

Appx. 757, 760 (10th Cir. 2010) (unpublished) (ALJ was not required to discuss lower GAF

scores that were "bits of information not essential to [the claimant's] RFC determination,

inadequate to establish disability, and contradicted by an opinion from an acceptable medical

source"); *Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's

opinion was thorough, and evidence not mentioned by the ALJ was not of such quality as to

require discussion).

Boehm criticizes the ALJ's concluding paragraph on credibility as meaningless

boilerplate, and the Court agrees with that characterization, while not sharing in the criticism.[2]  It

---

[2] "After careful consideration of the evidence, the undersigned finds that the claimant's
medically determinable impairment could reasonably be expected to cause the alleged symptoms;
however, the claimant's statements concerning the intensity, persistence and limiting effects of
these symptoms are not credible to the extent they are inconsistent with the above residual
functional capacity assessment."  (R. 13).

is fortunate that the ALJ actually analyzed Boehm's credibility in the two pages before this concluding paragraph, as the Court detailed above.  *See Kruse v. Astrue*, 2011 WL 3648131 at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis").  Because the ALJ gave specific reasons for his credibility assessment that were linked to substantial evidence, the ALJ's use of stock language in the introduction and conclusion to his discussion did not detract from his credibility assessment.[3]

Boehm complains that his medications were a factor supporting his credibility, but the ALJ did not ignore those medications.  (R. 11, 13).  Boehm also argues that his limited activities of daily living and the fact that none of his medical providers reported that he exaggerated his symptoms were additional facts that supported a favorable credibility finding.  Plaintiff's Opening Brief, Dkt. #13, pp. 9-10.  The Tenth Circuit rejected a similar argument when a claimant listed "certain pieces of favorable evidence."  *Stokes*, 274 Fed. Appx. at 685-86.  The Tenth Circuit said that the only question it needed to consider was whether the ALJ's adverse credibility assessment "was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion."  *Id.* at 686.  The Tenth Circuit found no reason to overturn the ALJ's credibility determination.  *Id.*  This Court also finds that the ALJ's

---

[3] Boehm makes the argument of improper boilerplate about another paragraph of the ALJ's decision.  Plaintiff's Opening Brief, Dkt. #13, p. 10.  The ALJ included an introductory paragraph stating that he had considered all of Boehm's symptoms "and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . ." (R. 11).  The sentence goes on to cite to regulations and rulings. *Id.*  This introductory paragraph is obviously boilerplate, but it is not improper.  It is, instead, a recitation of the required standards to be considered by an administrative law judge.  Again, had the ALJ not gone on to actually analyze Boehm's credibility, this boilerplate provision would not have been adequate to support his assessment, but this was not the case.

credibility assessment was closely and affirmatively linked to evidence that supported the conclusion that Boehm was not fully credible.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 30th day of March, 2012.

Paul J. Cleary
United States Magistrate Judge